IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | |
|---|---|
| CARLOS HAMER, | ) |
| | ) |
| Plaintiff, | ) |
| | ) CIVIL ACTION FILE NO. |
| v. | ) 1:15-CV-_____ |
| | ) |
| CITY OF ATLANTA, GEORGIA | ) |
| | ) JURY TRIAL REQUESTED |
| Defendant. | ) |

# COMPLAINT

COMES NOW Plaintiff, Carlos Hamer, by his undersigned counsel, and pleads as follows:

# PRELIMINARY STATEMENT

1. Plaintiff brings this action against Defendant for retaliation prohibited under the Participation and Opposition provisions in Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e et seq. ("Title VII") .

# PARTIES

2. Defendant City of Atlanta, Georgia is a body corporate and politic and a municipality of the State of Georgia, duly established under its laws and Constitution.

3. Plaintiff Carlos Hamer is a former employee of Defendant's Department of Watershed Management (hereinafter "Watershed Management").

1

## JURISDICTION AND VENUE

4. Plaintiff has satisfied the jurisdictional prerequisites to suit, having timely filed a charge of discrimination with the Equal Employment Opportunity Commission and having received a notice of right-to-sue within ninety days from the filing of this suit.

5. Plaintiff filed two charges. The initial charge, on or about April 2010 and a charge of retaliation, following his termination in July 2010. After a four year investigation the EEOC issued a probable cause determination on the second charge, finding that unlawful retaliation was the determining factor in Plaintiff's termination. The case was referred for review to the Department of Justice and a right-to-sue was issued in December 2014.

6. The federal question jurisdiction of this Court is invoked pursuant to 28 U.S.C. § 1331.

7. Plaintiff is a resident of the State of Georgia and submits to the jurisdiction of this Court by filing suit.

8. Defendant is a municipality in the State of Georgia and is subject to the jurisdiction of this Court.

9. All of the acts and omissions complained of herein occurred within the Northern District of Georgia.

10. Accordingly, venue is proper in this Court.

11. Defendant employed Plaintiff from October 16, 2003 until July 29, 2010.

12. Plaintiff's work with watershed management for Atlanta began in 1981 and he became a public employee when it became a public utility.

13.  Plaintiff's most recent position in Watershed Management was Safety Officer, Principal.

14. Throughout his seven years of employment with Watershed Management, Plaintiff consistently received highly effective ratings and fully satisfactory reviews with respect to job performance.

15. His termination on July 29, 2010 was not based on performance.

16. His termination occurred because he supported coworkers who had complained of discrimination and because he himself complained about such conduct, outlined below.

17. At all relevant times to the retaliation described herein, Mr. Dan Oakley was the Director of Safety and Security in the Watershed Department.

18. Plaintiff's direct supervisors (who reported to Dan Oakley) were Mr. Jerel Harris, the Director of Safety, and Mr. Jerry Jackson, a Safety Manager.

19. After Plaintiff engaged in the protected described below Plaintiff was removed from his location and duties, and required to report to Mr. Gerald Powe, who was assigned to watch Plaintiff closely, document all conduct and make daily reports of Plaintiff's activities.

BACKGROUND EVENTS LEADING TO CARLOS HAMER'S EEOC INVOLVEMENT

20. In 2009, Plaintiff began to observe increasingly hostile and abusive language from Mr. Jerry Jackson and Mr. Jerel Harris. This conduct took the form of regular verbal abuse and slurs about women (including female employees at Watershed Management), and White or Hispanic people.

21. Plaintiff is African American and while Jackson and Harris teased Plaintiff about his lighter complexion and his religion, he was not the main target of their regular abuse.

22. Mr. Jackson and Mr. Harris openly derided the way they believed white men smelled. On one occasion, Jackson noted to Plaintiff that "white people smell" and apparently deciding his point unmade clarified it, stating, "when they get wet . . . like a wet dog. "

23. On another occasion, referring to his decision not to promote a white candidate, Harris say he had "met his quota for Whites and Hispanics in Watershed "

24. It was not uncommon for derogatory terms about women to be used. Mr. Harris and Mr. Jackson even joked about a female colleague, Ms. Janet Gray, "using her pussy."

25. Plaintiff was not comfortable with racism or sexism, whether black or white and would not respond to such comments.

26. When possible, Plaintiff would leave a conversation that turned to slurs. But at times, that just wasn't possible. At times, comments were made in staff meetings and the two men making them were Plaintiff's supervisor and his supervisor.

27. At one meeting in 2009 the discussion turned to a new vacancy, Harris stated bluntly that whoever fills the post he "won't be white", because "he [Harris] had his fill of them." At that same meeting, Jackson agreed stating "you can't trust them." Jackson went on to say "they [Whites] oppress you."

28. Plaintiff was aware of the past and always mindful of the years of discrimination he and his fellow Black Americans and their parents before them endured, but he could not be comfortable with hatred in the guise of indignation.

29. Plaintiff was initially hesitant to stand up to Harris and Jackson. Their conduct was not covert or whispered. It was direct and unapologetic. One White coworker was confronted by Mr. Harris face to face and told "white people think they are smarter than us. " That colleague was denied a promotion and when the White colleague was not present Harris explained that he wouldn't have "that motherfucker that close to me."

30. Plaintiff spoke with his colleagues and six other coworkers, male and female, Black and White agreed to come forward and speak out to Mr. Dan Oakley and to the Employee Labor Relations Manager, Ms. Janet Essix.

31. On or about April, 2010, Plaintiff and these coworkers complained to Dan Oakley about Harris' and Jackson's racist remarks and discriminatory actions.

32. Mr. Oakley said an investigation would be conducted.

33. Later that month, Mr. Oakley met with Watershed employees and informed them there was no evidence that Harris and Jackson made racists remarks.

34. However the City's own Human Resources department found that inappropriate conduct had occurred and determined that Managers and supervisors at Watershed must receive training on basic issues of diversity and tolerance of other races in their roles as government representatives.

35. A mandatory meeting was announced for May 3, 2010 by Mr. Oakley but not for all employees. Only the six employees who came forward to complain about Harris and Jackson were summoned to the meeting.

36. Mr. Oakley announced that he felt the complaints about racism and sexism affected cohesion and that Plaintiff and a white colleague (both of whom had just filed EEOC charges) would be moved to a storage warehouse as part of a reorganization.

37. Oakley invited comments or suggestions and employees made several suggestions, including Plaintiff.

38. Specifically, Plaintiff emailed Oakley and expressed his fear that he was still going to be supervised by Harris, Jackson and their friend Gerald Powe. Plaintiff received no expression of policy on retaliation nor even an assurance against it. Instead, Mr. Oakley typed a one-word response to Plaintiff: "**Noted.**"

39. A few days later, Mr. Oakley implemented the reorganization which he claimed would resolve these kinds of problems.

40. The reorganization consisted of Plaintiff and the White colleague who had filed an EEOC charge being transferred to an isolated location where Plaintiff no longer performed the same duties or worked under the same conditions as he had prior to the "reorganization."

41. Between May 2010 and Plaintiff's termination on July 29, 2010, Plaintiff was assigned to work in a storage room in a moldy and poorly maintained building on Edgewood Avenue.

42. Plaintiff was told to report to Gerald Powe who was identified in the City's sworn filings to the EEOC as a Safety Supervisor while contemporaneously filing an affidavit in this District Court claiming (in regards another case) that

Powe was a Safety Analyst. In emails and documents authored by Powe during the period he refers to himself as Safety Superintendent.

43. Mr. Powe's job title was pretextual and somewhat irrelevant inasmuch as his primary duty was observing Plaintiff.

44. On information and belief, Mr. Powe was directed to keep constant watch on Plaintiff, to make the work environment physically and personally uncomfortable and make reports to Harris, Jackson and Oakley.

45. When Plaintiff objected to the stripping away of his duties, Mr. Powe taunted him, stating, that was not Plaintiff's concern anymore.

46. In one of their first conversations under the reorganization, Mr. Powe's told Plaintiff that Plaintiff's complaints about Harris and Jackson are the reason for this change.

47. Immediately after becoming Plaintiff's supervisor, Mr. Powe intervened to strip Plaintiff of previously scheduled conferences telling Plaintiff that other coworkers would represent the Watershed.

48. Mr. Powe, made hourly entries in a notebook which cross-referenced calendars, time clock printouts and personal observations on Plaintiff.

49. Safety Officers who had not come forward were not treated in this manner.

50. Also at their initial meeting, in late May 2010, Plaintiff was presented with a set of requirements not given to any other Watershed coworker similarly situated (except the White coworker who had also filed an EEOC charge)..

51. The requirements were listed on a sheet of paper prepared by Powe.  It required Plaintiff to perform any clerical duties in the storage room, banned him from using electronic means of correspondence in his duties (i.e. emails pdf) and demanded that he [Powe] receive a hardcopy, personally of all required paperwork and reports.

52. The list of new rules, applicable to Plaintiff also required hat lunch breaks occur at noon each day and end at 1:00 p.m. each day; that Plaintiff report to Powe in person at 8:30 every morning in and every afternoon at 3:45 before leaving no earlier than 5:00 p.m., and that Plaintiff perform a quota of inspections on a daily basis that could not reasonably or safely be conducted.

53. Plaintiff was a salaried employee who had worked for Watershed entities since 1981 and who had an excellent performance record throughout his years of service. No reason other than the participation in EEOC proceedings and opposition to bias comments existed for these new rules.

54. None of these requirements had been part of Plaintiff's job prior to his EEOC filing and opposition activity.

55. The City's recommendation for diversity training was mocked and ignored after a single meeting identified by Harris as "sensitivity training." The first and only sensitivity training meeting was actually presided over by Harris and Jackson.

56. Between late May 2010 and his termination on July 29, 2010, Oakley, Harris, Jackson and Power were in constant email communication about Plaintiff's treatment and working conditions.

57. On one occasion, in response to an email specifically identifying Powe's conduct as retaliation, Mr. Oakley responded that this is a management directive and that Powe better make sure it is carried out.

58. On another occasion, after an onsite EEOC interview in June 2010, Plaintiff emailed Ms. Essix stating that when the EEOC investigator left, Mr. Jackson approached the interviewed employee and asked her what she said about him, Oakley and Harris.

59. Plaintiff believed that such questioning would interfere with a witnesses' candor and he told Ms. Essix (the Employee and Labor Relations Manager) that he thought it was harassment.

60. Essix responded by stating Plaintiff's assertion was libelous and that any more false or libelous statements or claims could result in termination.

61. In fact, Plaintiff's termination was because of a false statement but not his own.

62. Plaintiff was required to move his office to the new location. Plaintiff did move his office as instructed.

63. Mr. Oakley and Mr. Powe stated repeatedly that Plaintiff had not moved his office. In fact, Plaintiff's desk, his personal effects, everything that could be moved, was moved.

64. Plaintiff even put up a note on his office door where he worked, stating that this is retaliation.

65. Without the slightest pull of cognitive dissonance, Oakley then reprimanded Plaintiff for putting up the sign on his office door, the same office

66. Plaintiff took it down and continued to report as requested but his conduct stopped being accurately reflected.

67. Mr. Powe (in one of his many diary entries about Plaintiff), lists medical leave as vacation leave (even after approving the medial leave). On days, Plaintiff performed certain duties, Mr. Powe reported other actions.

68. Mr. Powe's diary entries suggest a growing impatience with Plaintiff's tenacity.

69. Finally, Mr. Oakley issued a written notice of separation stating Plaintiff hadn't moved to the new office. In fact he had been in the new office for weeks.

70. In the six weeks after his protected activity Plaintiff was increasingly ostracized and isolated.

71. The City's proffered reason was pretext for retaliation.

## COUNT I

## RETALIATION IN VIOLATION OF TITLE VII

1. Plaintiff restates and re-alleges paragraphs 1-71 of the Complaint as if fully set forth herein.

2. By the conduct stated, Defendant has RETALIATED against Plaintiff because of his opposition to conduct made unlawful by Title VII and because of his participation through his EEOC filings.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays:

(a) That the Court enter judgment against Defendant for wages lost due to termination;

(b) That the Court enter judgment against Defendant for compensatory damages to the maximum allowable under Title VII;

(c) That the Court enter judgment against Defendant for Plaintiff's expenses of litigation incurred in this matter, including reasonable attorneys' fees;

(d) That the Court grant Plaintiff's request for a jury trial; and

(e) That the Court grant Plaintiff such other and further relief at it deems just and proper.

This 3rd day of March 2015.

**s/ John D. Wales, Esq.**
Georgia Bar No. 730785
Attorney for Plaintiff
LAW OFFICES OF JOHN D. WALES
600 Village Trace., Suite 175
Marietta, Georgia 30067
Telephone:  (770) 850-2545
Facsimile: (770) 850-2548
Email: JohnDWales@aol.com